**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**LARRY F ROSSHIRT, III,**

        **Plaintiff,**

   v.                                  **Civil Action 2:19-cv-3280
Judge James L. Graham
Magistrate Judge Kimberly A. Jolson**

**COMMISSIONER OF
SOCIAL SECURITY,**

        **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Larry F. Rosshirt, III, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). For the reasons set forth below, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 14) be **OVERRULED** and that judgment be entered in favor of Defendant.

**I.    BACKGROUND**

Plaintiff filed his applications for DIB and SSI on January 16, 2015, alleging that he was disabled beginning November 1, 2014. (Tr. 245–51, 252–257). After his applications were denied initially and on reconsideration, the Administrative Law Judge ("ALJ") held a hearing on June 5, 2018. (Tr. 12–41). On July 2, 2018, the ALJ issued a decision denying Plaintiff's application for benefits. (Tr. 111–28).

The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–6). Plaintiff filed the instant case on July 29, 2019 (Doc. 1). This matter is now ripe for resolution. (*See* Docs. 9, 14, 16).

**A. Relevant Medical Evidence**

Plaintiff's statement of errors concerns his alleged physical and mental impairments. The ALJ began by summarizing the relevant evidence regarding his physical impairments:

> In terms of the claimant's alleged neck and back pain, the record documented degenerative disc and joint disease of the spine (Exhibits 1F; 3F; 6F; 10F). In May 2014, the claimant showed normal range of motion to the spine, with normal muscle tone and normal gait, station, and coordination (Exhibit 1F/3). In June 2014, the claimant showed tenderness to palpation of the facet joints of the spine and the cervical spine, but continued to exhibit full range of motion (Exhibit 1F/6). The claimant was assessed with cervical and lumbar strain (Exhibit 1F/7). The claimant demonstrated no gait abnormalities (Exhibit 1F/9). She showed positive straight leg testing and tension and tightness over the spine (Exhibit 1F/12). The symptoms stemmed from a motor vehicle accident he sustained in June 2014 (Exhibit 3F/1). The claimant reported he was rear ended while stopped (Exhibit 3F/1). Since the accident, he reported achy neck and back pain (Exhibit 3F/1). He was diagnosed with spinal degeneration in the cervical, thoracic, and lumbar spines, as well as scoliosis (Exhibit 3F/2). Treatment notes documented decreased flexion and extension in the cervical and lumbar spines (Exhibit 3F/3). The claimant in July 2014 started physical therapy (Exhibit 1F/16). He was placed in core and postural strengthening and was improving after sessions (Exhibit 1F/16). He showed improved capacity for strength and activity with decreased pain and tension in both the neck and back (Exhibit 1F/16, 18). The claimant continued in physical therapy through August 2014 (Exhibit 1F/29). He showed improvement, with minimal stiffness and good to normal strength in the lower extremities (Exhibit 1F/29, 32). After achieving three out of five therapy goals and showing no greater than 4/10 pain he was discharged from therapy (Exhibit 1F/33). The claimant was noted to have normal muscle tone, gait, station, and coordination were normal and affect and memory were also normal (Exhibit 1F/37, 40). The claimant's straight leg testing was negative (Exhibit 10F/2). The claimant remained oriented and there was no evidence of focal deficits (Exhibit 10F/2). In November 2014, the claimant maintained normal range of motion, no edema, and showed ongoing normal reflexes, muscle tone, gait, station, and coordination (Exhibit 10F/13).
>
> It should be noted as a result of the cervical spine degeneration and pain, the claimant reported deficits in functioning in the upper extremity, specifically in the right hand. The record supported the claimant had a slight loss in right grip strength (Exhibit 3F/3). While there was a lack of grip strength, there was no associated atrophy.

(Tr. 117–18).

The ALJ then turned to Plaintiff's alleged mental impairments:

In addition to his physical conditions, the claimant reported mental health problems. The record documented the claimant was diagnosed with an attention deficit and a bipolar disorder (Exhibits IF; 2F; 4F; *SF;* 6F; 7F; 8F; 9F; 10F; 11F; 12F; 13F; 16F; 18F; 19F; 20F). The record supports a longitudinal history of mental health conditions (Exhibit 12F). The claimant despite his conditions in 2007 and 2008 was attending school (Exhibit 12F/60, 74, 76). During 2009, he was doing well on medications (Exhibit 12F/52). His condition was assessed stable, without medicinal side effects (Exhibit 12F/50). During 2011, he self reported he was so much better since starting medications (Exhibit 12F/41). In 2012, the claimant reported his medications were managing his symptoms (Exhibit 12F/30, 39).

During 2013, the claimant reported his mood was better controlled with medication (Exhibit 12F/12; 13F/5). He endorsed no depression and was cooperative, but reported some issues with attention (Exhibit 12F/12; 13F/5). He had no psychosis and his judgment and impulse control were intact (Exhibit 13F/5). During August 2013, he showed good attitude and mood, with no suicidal or homicidal ideation (Exhibit 13F/14). In October 2013, he reported being upset due to his hours being cut back at work (Exhibit 12F/1, 4). However, the record supported ongoing logical and linear goal oriented thoughts without suicidal or homicidal ideation (Exhibit 12F/4).

During 2014, the claimant was noted to be hyperactive but he was oriented and showed normal affect (Exhibit 1F/1, 3). The claimant was prescribed medications, including Mametrigine (Exhibit 1F/41). Treatment notes showed some breakthrough symptoms of agitation and irritable mood, with distraction and symptoms of being quick to anger (Exhibit 2F/1). The claimant reported little tolerance to stress and his medications were adjusted (Exhibit 2F/3). The claimant admitted his medications gave him a filter (Exhibit 2F/5). During December 2014 the claimant said he was trying to stay busy and remain positive (Exhibit 2F/7).

Upon consultative examination during 2015, the claimant reported he was in psychological treatment and admitted his medication were helpful (Exhibit 4F/2-3). He evidenced reduced social skills and showed some pressured speech, but his mood was within the normal range (Exhibit 4F/4). He had an anxious and agitated affect, but denied any suicidal ideation (Exhibit 4F/4). The claimant reported no panic attacks but admitted agitation (Exhibit 4F/4). Treatment notes documented some euthymic mood but quickness to irritation (Exhibit SF/1). The claimant reported being frustrated and irritated (Exhibit SF/2). He stated he has a low tolerance for stress, but admitted he continued to do well taking his prescribed medications (Exhibit SF/5).

During 2016, the claimant reported an angry mood and in early 2016, he required psychological hospitalization for 10 days after reported noncompliance with medications and use of illicit rugs (Exhibit 6F). After inpatient hospitalization, the

claimant was referred for outpatient treatment (Exhibit 7F). The outpatient treatment notes show the claimant was doing well without concerns, appearing pleasant and cooperative showing good eye contact without psychomotor abnormalities and evidencing euthymic mood (Exhibit 7F/3). The claimant selfreported he was doing very well (Exhibit 7F/4). The claimant exhibited limited judgment and behavioral control and showed irritability and easy stress (Exhibit l 1F/10). In November 2016, the claimant reported he was doing fairly well (Exhibit 18F/7). In December 2016, there was no recent symptoms and he wanted to continue his current medications, showing normal psychomotor activity and logical thought processes with normal cognition (Exhibit 18F/5).

During 2017, the claimant continued engaging in treatment (Exhibit 18F). During June 2017, he was doing fairly well and reported no manic symptoms (Exhibit 20F/1). His moods were notably stable, he was well dressed and groomed, and showed good eye contact (Exhibit 20F/1). The claimant was euthymic and calm, and showed normal cognition (Exhibit 20F/3). The record supports in July 2017, the claimant was compliant with medications, reporting he was eating and sleeping well (Exhibit 18F/2). He was observed to be cooperative with good eye contact, euthymic, and calm (Exhibit 18F/2). The claimant showed no signs of being hyperactive and there was no evidence of attention problems (Exhibit 18F/2). The claimant demonstrated normal thought content normal cognition and good judgment (Exhibit 18F/2). He remained on medications, including Lamictal and Risperdal and his bipolar was assessed in remission (Exhibit 18F/3).

During October 2017, the most recent evidence of record noted the claimant reported no symptoms of depression or mania and indicated that any symptoms felt after reducing his medication dose had stopped (Exhibit 18F/1). He was not feeling hyperactive or inattentive (Exhibit 18F/1). The claimant showed good eye contact and was cooperative, euthymic and remained calm (Exhibit 18F/1). He evidenced no suicidal or homicidal ideations and maintained normal cognition with no memory problems (Exhibit 18F/1).

Despite reports of ongoing concentration and memory issues, as well as liable moods, the record supports the claimant's symptoms responded well to treatment, including counseling and medications. The claimant required no emergency treatment since February 2016, during a period of noncompliance.

(Tr. 118–20).

### B. The ALJ's Decision

In his decision, the ALJ found that Plaintiff had engaged in substantial gainful activity since his alleged onset date of disability of November 1, 2014. (Tr. 114). However, he found that there had been a continuous 12-month period during which the claimant did not engage in

4

substantial gainful activity. (*Id*.) The ALJ found that, during the period during which the claimant did not engage in substantial gainful activity, Plaintiff had the following severe impairments: a bipolar disorder; an attention deficit disorder; degenerative disc/joint disease of the spine and residual right-hand grip deficit. (*Id*.). The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (*Id*.).

As for Plaintiff's residual functional capacity ("RFC"), the ALJ opined:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant could frequently operate hand controls and frequently handle with the right hand. He could occasionally climb ladders, ropes, and scaffolds, stoop and crawl. The claimant could frequently kneel and crouch. The claimant could understand, remember, and carry out simple, repetitive tasks and respond appropriately to supervisors and coworkers without public contact and with occasional interaction with coworkers. The claimant would be able to adapt to simple changes and avoid hazards in a setting without strict production quotas.

(Tr. 116). He found that:

> [a]fter careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(Tr. 117).

The ALJ, therefore, determined that, "considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a))," including deli slicer, office helper, and mail clerk. (Tr. 126–27).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v.*

5

*Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III. DISCUSSION

Plaintiff asserts three assignments of error. First, that the ALJ failed to evaluate Plaintiff's traumatic brain injury as a severe impairment and failed to consider it in his RFC. (*See* Doc. 14 at 15–18). Second, Plaintiff asserts that the ALJ improperly evaluated the opinion of his mental health nurse practitioner, Ms. Rush. (*See id*. at 18–19). And finally, Plaintiff asserts that the ALJ erred in weighing the opinion of Dr. Cook. (*See id*. at 19–22). The Court addresses each of these arguments in turn.

### A. Traumatic Brain Injury

Plaintiff first argues that the ALJ erred in evaluating his traumatic brain injury. (*See* Doc. 14 at 15–18).

At step two, the ALJ is required to consider whether Plaintiff's alleged impairments

constitute "medically determinable" impairments. *See* 20 C.F.R. § 404.1508; 20 C.F.R. § 404.1520(a)(4)(ii). A medically determinable impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques," and "must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms." 20 C.F.R. § 404.1508. Only evidence from acceptable medical sources can establish a medically determinable impairment. 20 C.F.R. § 404.1513(a) ("We need evidence from acceptable medical sources to establish whether you have medically determinable impairment(s)"). Additionally, an impairment must meet the durational requirement, meaning, "it must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 404.1509. And "[i]f an alleged impairment is not medically determinable, an ALJ need not consider that impairment in assessing the RFC." *See Jones v. Comm'r of Soc. Sec.*, No. 3:15-CV-00428, 2017 WL 540923, at *6 (S.D. Ohio Feb. 10, 2017) (citing *Rouse v. Comm'r of Soc. Sec.*, No. 2:16-CV-0223, 2017 WL 163384, at *4 (S.D. Ohio Jan. 17, 2017) (stating that a "claimed condition which is not 'medically determinable' need not be considered at all" in determining a claimant's RFC); 20 C.F.R § 404.1527(a)(1); 20 CFR § 404.1545(a)(2)).

The Sixth Circuit construes the Step Two severity regulation as a "*de minimis* hurdle," *Rogers*, 486 F.3d at 243 n. 2 (internal quotation marks and citation omitted), intended to "screen out totally groundless claims," *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985). Thus, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ must treat it as "severe." *See* Soc. Sec. Rul. 96–3p, 1996 WL 374181 at * 1 (1996). Because the regulations require an ALJ to consider both severe and non-severe impairments in the remaining steps of the disability determination analysis, once a severe

impairment is found, all impairments, regardless of how they are classified, will be analyzed in the ALJ's determination. *See Dyer v. Colvin*, No. CV-14-156-DLB, 2016 WL 1077906, at *3 (E.D. Ky. Mar. 17, 2016). "For this reason, the Sixth Circuit has consistently held that an ALJ does not commit reversible error when he or she decides that some of claimant's impairments are not severe, but finds that other impairments are severe and proceeds with his or her analysis." *Id.*

The ALJ did not err in analyzing Plaintiff's alleged traumatic brain injury. As Plaintiff notes, the record includes findings that Plaintiff had a history of traumatic brain injury and concussions that contributed to his impulsivity, agitation, memory loss, poor attention span, and limited executive functions. (Doc. 14 at 16–17). Although he did not explicitly identify traumatic brain injury as the cause of these potential functional limitations, the ALJ reviewed and analyzed these limitations in detail. (*See* Tr. 118–20). Indeed, in formulating Plaintiff's RFC, the ALJ noted that Plaintiff: was diagnosed with an attention deficit disorder, (Tr. 118); "reported some issues with attention," (*id.*); "was noted to be hyperactive," (Tr. 119); "showed some breakthrough symptoms of agitation and irritable mood, with distraction and being quick to anger," (*id.*); "reported little tolerance to stress," (*id.*); "evidenced reduced social skills and … had an anxious and agitated affect," (*id.*); and "exhibited limited judgment and behavioral control and showed irritability and easy stress, (*id.*).

But, the ALJ found, "[d]espite reports of ongoing concentration and memory issues, as well as liable moods, the record supports the claimant's symptoms responded well to treatment, including counseling and medication." (Tr. 120). Substantial evidence supports this conclusion. (Tr. 118–20 (summarizing evidence corroborating conclusion that Plaintiff's mental impairments were mild in nature and that he responded well to treatment)). Based on this finding, the ALJ reduced Plaintiff's RFC:

> to the performance of a limited range of light work, noting he could understand, remember, and carry out simple, repetitive tasks and respond appropriately to supervisors and coworkers without public contract and with occasional interaction with coworkers; would be able to adapt to simple changes; and could avoid hazards in a setting without strict production quotas.

(Tr. 120).

In short, after finding severe impairments at Step 2 of his analysis, the ALJ considered the effects of Plaintiff's traumatic brain injury in analyzing Plaintiff's RFC and limited his RFC accordingly. The ALJ did not err as a result.

**B. Nurse Practitioner Rush's Opinion**

Second, Plaintiff argues that the ALJ erred when he failed to consider the opinion evidence of his nurse practitioner, Ms. Rush. (*See* Doc. 14 at 18–19). The Court disagrees.

Ms. Rush is not an "acceptable medical source" pursuant to Social Security Ruling SSR 06-03P (the "Ruling"); instead, she is an "other source." *See* SSR 06-03P (S.S.A.), 2006 WL 2329939, at *2.[1] "Other sources" cannot establish the existence of a medically determinable impairment but "may provide insight into the severity of the impairment and how it affects the individual's ability to function." *Id*. These opinions are "important" and should be evaluated by using the applicable factors, including how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion. *Id*. at *4–5. ALJs may also consider the degree to which the source presents relevant evidence to support the opinion, whether the source has a particular expertise, and "any other factor supporting or refuting the opinion." *Davila v. Comm'r of Soc. Sec.*, 993 F. Supp. 2d 737, 757–58 (N.D. Ohio 2014) (internal quotation marks and citations omitted). But there is no "reasons-giving

---

[1] This regulation has been rescinded. It still applies, however, to claims (like this one) filed before March 27, 2017. 20 CFR § 404.1527.

9

requirement" for non-treating source opinions. *Martin v. Comm'r of Soc. Sec.*, 658 F. App'x 255, 259 (6th Cir. 2016).

On or about January 27, 2015, Ms. Rush completed a questionnaire in which she described Plaintiff's "mental status abnormalities," "cognitive status," and other information related to Plaintiff's alleged mental impairments. (Tr. 428–29). The ALJ repeatedly cited that exhibit in his opinion. (*See* Tr. 118 (citing, among other things, Exhibit 2F) ("The record documented that the claimant was diagnosed with an attention deficit disorder and bipolar disorder."); Tr. 119 (citing Exhibit 2F/1) ("Treatment notes showed some breakthrough symptoms of agitation and irritable mood, with distraction and being quick to anger.")). But he apparently did not analyze Ms. Rush's answers to the questionnaire as opinion evidence. (*See* Tr. 122–24)

The ALJ's failure to consider Ms. Rush's questionnaire as opinion evidence is understandable. It was submitted with more than a year of progress notes from Central Ohio Behavioral Medicine and did not express opinions regarding Plaintiff's functional limitations in work-related terms. (*See* Tr. 428–47). To the extent the ALJ should have considered it as opinion evidence and failed to evaluate Ms. Rush as an other source, that was harmless error.

"[I]f an agency has failed to adhere to its own procedures," remand is inappropriate unless "the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) (citation and quotations omitted); *see also Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004) (quoting *NLRB v. Wyman–Gordon Co.,* 394 U.S. 759, 766 n.6 (1969)) ("When 'remand would be an idle and useless formality,' courts are not required to 'convert judicial review of agency action into a ping-pong game.'"). Plaintiff bears the burden of showing the alleged error was harmful. *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he burden

of showing that an error is harmful normally falls upon the party attacking the agency's determination.").

Plaintiff's argument has several problems. First, his Statement of Errors offers the conclusory assertion that the ALJ's alleged error was harmful because Ms. Rush's questionnaire "supports more significant limitations than those outlined in the ALJ's assessed RFC, and also support the findings of Dr. Smith (the Social Security Consultative Examiner (Tr. P. 451)) and Dr. Venkata (Tr. P. 678)." (Doc. 14 at 19). But he does not develop this argument and, without more, has not met his burden of showing the alleged error was harmful.

Second, after Defendant raised the harmless error defense in response, (*see* Doc. 16 at 10–13), Plaintiff filed no reply. And because the burden is on Plaintiff to demonstrate that the ALJ's alleged error was harmful, this lack of response undermines Plaintiff's position here.

Third, the Undersigned has conducted an independent review of the record and concludes that the ALJ's alleged error was harmless. In formulating Plaintiff's RFC, the ALJ reviewed Ms. Rush's questionnaire, (*see* Tr. 119 (citing Exhibit 2F/1)), and considered the opinion evidence of multiple medical sources that mirrored Ms. Rush's answers to the questionnaire, (*see* Tr. 122–25). Because the record generally reflected mild symptoms that responded well to treatment, the ALJ discounted opinion evidence, like Ms. Rush's, that suggested more extreme functional limitations. (Tr. 125). In short, the ALJ considered the substance of Ms. Rush's questionnaire and offered an adequate explanation for discounting similar evidence. The Undersigned finds that the ALJ's alleged failure to treat Ms. Rush's questionnaire as opinion evidence was not harmful, and, therefore, remand is not warranted. *See Rabbers*, 582 F.3d at 654; Shkabari v. Gonzales, 427 F.3d 324, 328 (6th Cir. 2005) (citation and quotations omitted) ("[N]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason

11

to believe that the remand might lead to a different result."); *accord Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507 (6th Cir. 2006) (applying harmless error rule where the ALJ failed to articulate his reasons for crediting or discrediting each medical opinion).

### C. Examining Psychologist Dr. Cook's Opinion

Plaintiff argues that the ALJ did not properly consider the opinion of an examining psychologist, Dr. Cook. (Doc. 14 at 19–22). This argument is similarly unpersuasive.

"The Social Security Administration defines three types of medical sources: non-examining sources, non-treating (but examining) sources, and treating sources." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 273 (6th Cir. 2015) (citing 20 C.F.R. § 404.1502). when the opinion comes from a non-treating or non-examining source, it is usually not entitled to controlling weight. 20 C.F.R. § 404.1527(c)(2). Rather, the ALJ should consider relevant factors, including supportability, consistency, and specialization. 20 C.F.R. § 404.1527(d)(2). There is however, no "reasons-giving requirement" for non-treating source opinions. *Martin v. Comm'r of Soc. Sec.*, 658 F. App'x 255, 259 (6th Cir. 2016). Rather, the ALJ must provide only "a meaningful explanation regarding the weight given to particular medical source opinions." *Mason v. Comm'r of Soc. Sec.*, No. 1:18 CV 1737, 2019 WL 4305764, at *7 (N.D. Ohio Sept. 11, 2019) (citing SSR 96-6p, 1996 WL 374180, at *2).

Here, after an interview with Plaintiff, Dr. Cook opined that Plaintiff had significant cognitive and behavioral limitations as a result of his mental impairments. (Tr. 557–59). The ALJ reviewed Dr. Cook's opinion:

> The undersigned has read and considered the statement from a physician noting the claimant was not able to manage his money and that long term disability should be considered. (Exhibit 11F/11). This statement was rendered in April 2016 and was based upon a one time neurological consultation with the claimant. First, it should be noted, the determination of disability is one reserved for the Commissioner. Second, while the claimant reflected alleged disabling limits during this specific

12

> consultative examination, routine treatment notes a month prior to his neuropsychological evaluation, the claimant was observed to have good eye contact, no psychomotor abnormalities, and linear/goal directed thoughts, exhibiting no evidence of suicidal or homicidal ideation (Exhibit 7F/3). The claimant evidenced no euthymic mood and insight and judgment were intact (Exhibit 7F/3). The claimant showed average intelligence and intact memory and concentration. Thus, the undersigned finds the disability limitation less persuasive, as it was not consistent with the routine outpatient treatment notes of record. The undersigned affords some weight to the limitation on managing his money, as the record supports a history of manic episodes with excessive spending. As such overall, the undersigned finds the statement no more than somewhat persuasive and gives the statement no more than some weight.

(Tr. 123).

Contrary to Plaintiff's argument, this is "a meaningful explanation regarding the weight given to" Dr. Cook's opinion, *Mason* 2019 WL 4305764, at *7 (citing SSR 96-6p, 1996 WL 374180, at *2). The ALJ considered Dr. Cook's opinion and contrasted it with contemporaneous treatment notes, finding that it was inconsistent with "routine outpatient treatment notes of record." (Tr. 123). That is all that was required of the ALJ here.

Plaintiff disagrees. He maintains that the ALJ failed to discuss the relevant regulatory factors and erred accordingly. (*See* Doc. 14 at 20–21 (discussing factors under 20 C.F.R. § 404.1527(d)(2)). But "nothing within [the regulations] mandates that every factor be explicitly addressed." *Moore v. Berryhill*, No. 3:17-CV-165-HBG, 2018 WL 3557346, at *6 (E.D. Tenn. July 24, 2018) (collecting cases); *see also Prince v. Astrue*, No. 2:10-CV-00008, 2011 WL 1124989, at *8 (S.D. Ohio Jan. 11, 2011), *report and recommendation adopted*, No. 2:10-CV-00008, 2011 WL 1124986 (S.D. Ohio Mar. 25, 2011) (quoting *Tilley v. Comm'r of Soc. Sec.*, No. 09–6081, 2010 WL 3521928, at *6 (6th Cir. Aug. 31, 2010)) ("There is no requirement, however, that the ALJ 'expressly' consider each of the factors within the written decision."). This argument fails as a result.

Plaintiff further contends that the ALJ cherry-picked the record in discounting Dr. Cook's opinion. (Doc. 14 at 21–22). If that were true, remand might be warranted. *See Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports"). But Plaintiff's argument ignores that "the ALJ's decision is read 'as a whole and with common sense.'" *Mitchell v. Comm'r of Soc. Sec.*, No. 1:19-CV-1401, 2020 WL 1316350, at *12 (N.D. Ohio Mar. 12, 2020), *report and recommendation adopted*, No. 1:19 CV 1401, 2020 WL 1322862 (N.D. Ohio Mar. 20, 2020) (quoting *Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678–89 (7th Cir. 2010)). And the ALJ's whole decision here reflects a thorough and balanced review of the record, including evidence that contradicted his ultimate conclusion. (*See* Tr. 116–25). Plaintiff's argument to the contrary is without merit as a result.

## IV. CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 14) be **OVERRULED** and that judgment be entered in favor of Defendant.

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further

evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.


Date: March 26, 2020                                     /s/ Kimberly A. Jolson
                                                         KIMBERLY A. JOLSON
                                                         UNITED STATES MAGISTRATE JUDGE